## THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE and Glenda Pierson, Appellants,

### v.

## Linda THOMAS as personal representative for the Estate of Damon Hollimon, deceased, and Ashley Dominique Hollimon, Appellees.

### No. 01–04–01084–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 19, 2007.

---

Bill Davis, Office of Attorney General (MC059), Maurice L. Taylor, Office of the Attorney General, Austin, Sean Daniel Jordan, Office of the Attorney General, Houston, TX, for Appellants.

Douglas C. Sikes, Provost*Umphrey Law Firm, L.L.P., Beaumont, TX, for Appellees.

Panel consists of Justices NUCHIA, KEYES, and HANKS.

## OPINION

SAM NUCHIA, Justice.

Appellants, The Texas Department of Criminal Justice (TDCJ) and Glenda Pierson (Pierson), bring this interlocutory appeal of the orders of the trial court denying TDCJ's plea to the jurisdiction and Pierson's motion for summary judgment.[1] TDCJ's plea asserted sovereign immunity from suit, and Pierson's motion for summary judgment asserted qualified immunity. We reverse and render.

## BACKGROUND

The deceased, Damon Hollimon, was incarcerated in TDCJ's Estelle Unit in

---

1. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(5), (8) (Vernon Supp.2006).

Huntsville, Texas and was in a sex-offender treatment program. He had been diagnosed as paranoid-schizophrenic, but had been in remission and was not taking any medication. However, because his condition was deteriorating and he was becoming increasingly tense, agitated, defensive, and violent, the decision was made to transfer Hollimon to a psychiatric unit. A "move team" of five officers was sent to Hollimon's cell. Pierson, a University of Texas Medical Branch (UTMB) nurse, was called in to advise whether there was any reason that pepper spray should not be used to subdue Holliman and to provide medical assistance as needed during the move. Pierson and the members of the move team were wearing gas masks. After reviewing Holliman's medical chart, Pierson found no reason why chemical restraint should not be used. Pierson, in her notes, recorded the time of various events in this forced move.

The move team first asked Holliman to leave his cell at 3:21 p.m., and Holliman refused. At 3:22, a member of the team discharged a canister of pepper spray in Holliman's direction. Holliman coughed, but refused to move. The officer waited two minutes, then discharged a second canister of pepper spray, with the same result. After another two minutes, the officer discharged a third canister, but Hollimon still refused to move. At 3:28 p.m., the officers entered the cell to force Hollimon out, and Hollimon, who was described as having a "well developed, well nourished, muscular" body, resisted. The ensuing struggle resulted in a "major use of force" by the team, with Hollimon face-down on the floor and an officer pressing his knee down on the back of Hollimon's

neck as other officers secured Hollimon's hands and feet. At 3:31 p.m., the hand and leg restraints were in place, and Hollimon was on his side in the cell. A second 3:31 entry, the last entry by Pierson, noted that Hollimon was brought out of the cell and summarized the actions that resulted in Hollimon's arrival at the medical department.[2]

As the officers picked Hollimon up and moved him out of the cell, Pierson saw that his neck was limp and his head was "wobbly" and thought that his neck had been broken. She checked his vital signs and found that he had no carotid pulse, no heart rate, was not breathing, and had fixed and dilated pupils. Pierson testified that she did not remove her gas mask to perform cardiopulmonary resuscitation because she would then have been exposed to the pepper spray and would have needed medical attention herself and thus would not have been of any assistance to Hollimon. After checking Hollimon's vital signs, Pierson told the officers to take Hollimon to the medical department "now."

The move team carried Hollimon toward the prison medical department, which, according to trial testimony, was a one-and-one-half to two-and-one-half minute walk from the cell. They had to go down a flight of stairs and pass through a "wing picket gate," which was locked. However, the guard was not on duty, and they had to find another guard to unlock the gate. Medical personnel were waiting on the other side of the gate with a stretcher and took Hollimon across the hall to the medical department. Hollimon arrived at the

2. That final entry consisted of the following: 1531 Offender is brought out of the cell by SORT, and noted head wobbly. Unable to palpate carotid pulse.... Pupils dilated 4–5mm. Unable to ausculate heart beat. Security informed carry to medical department now. Medical assistance upon arrival to door out of A wing. Placed on stretcher and to med dept.—SPierson RN

medical department at 3:38 p.m., seven minutes after he was removed from the cell. Cardiopulmonary resuscitation was attempted, but Hollimon did not respond and was pronounced dead. An autopsy disclosed that Hollimon died from asphyxiation, and Pierson and members of the move team wrote reports of the incident. TDCJ investigated the incident, and the Walker County District Attorney conducted a criminal investigation, but no charges were filed.

On June 12, 1998, four months after Hollimon's death, an attorney wrote to the warden of the Estelle Unit as follows:

I write this letter on behalf of the surviving daughter, and the personal representative of the Estate of Damon L. Hollimon. Ashley D. Hollimon, a minor, is the sole surviving child of Damon L. Hollimon. Linda Thomas, Ashley's mother, is the personal representative of the Estate of Damon L. Hollimon. Please see attached Affidavit of Personal Representative, Affidavit of Heirship, and Death Certificate of Damon L. Hollimon.

As evidenced by the Death Certificate, Mr. Hollimon died of asphyxiation on February 18, 1998, while an inmate at the Estelle Unit of the Texas Department of Corrections.

At this time, I request copies of medical records, investigative reports, and video tapes relating in any way to the death and the circumstances surrounding the death of Mr. Hollimon. If there is a charge for these documents, please advise.

On February 12, 1999, appellees[3] sued TDCJ, its executive director, the warden of the Estelle Unit, and unnamed prison guards, asserting causes of action under the Texas Tort Claims Act,[4] wrongful death and survival statutes,[5] and section 1983[6] for violations of civil rights. In an amended petition, appellees added UTMB, Pierson individually and in her capacity as nurse for UTMB, and nine employees of TDCJ. UTMB filed a plea to the jurisdiction, asserting sovereign immunity from suit for the wrongful death claim and arguing that appellees' claims against UTMB did not fall under the Texas Tort Claims Act. The trial court granted UTMB's plea and dismissed the claims against UTMB. Pierson filed a similar plea to the jurisdiction, which the court granted, and the claims against her in her official capacity were dismissed. Appellees filed a second amended petition in which they asserted only a section 1983 claim against Pierson individually and a claim under the Texas Tort Claims Act against TDCJ. TDCJ filed a plea to the jurisdiction asserting sovereign immunity and a motion for summary judgment asserting lack of notice. The trial court denied these motions. Pierson filed a motion to dismiss and motion for summary judgment, which the court also denied. This appeal followed.

## DISCUSSION

### *TDCJ's Appeal: Notice*

In September 2005, TDCJ filed a supplemental brief, asserting for the first time lack of notice as a jurisdictional bar to the suit. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex.

---

**3.** During the pendency of this lawsuit, Ashley Dominique Hollimon reached her majority and joined the suit in her individual capacity.

**4.** Tex. Civ. Prac. & Rem.Code Ann. §§ 101.001–109.109 (Vernon 1997 & Supp.2006).

**5.** Tex. Civ. Prac. & Rem.Code Ann. §§ 71.001–71.052 (Vernon 1997 & Supp.2006).

**6.** 42 U.S.C. § 1983 (2000).

1993) ("Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties."). Therefore, we first consider TDCJ's notice issue. TDCJ asserts, "The absence of notice under Texas Civil Practice and Remedies Code § 101.101 divests the trial court of subject-matter jurisdiction." Section 101.101 provides as follows:

(a) A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:

(1) the damage or injury claimed;

(2) the time and place of the incident; and

(3) the incident.

. . . .

(c) The notice requirements provided or ratified and approved by Subsections (a) and (b) do not apply if the governmental unit has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged.

TEX. CIV. PRAC. & REM.CODE ANN. § 101.101 (Vernon 2005). Texas courts of appeals have been divided in determining what constitutes "actual notice" for the purpose of this statute and in how they treat the lack of notice. The supreme court settled the issue of what constitutes actual notice in *Texas Department of Criminal Justice v. Simons*, 140 S.W.3d 338 (Tex.2004). In that case, the court held "that actual notice under section 101.101(c) requires that a governmental unit have knowledge of the information it is entitled to be given under section 101.101(a) and a *subjective awareness that its fault produced or contributed to the claimed injury.*" *Id.* at 348 (emphasis added). The court explained that the purpose of the statute is "to enable governmental units to gather information nec-

essary to guard against unfounded claims, settle claims, and prepare for trial." *Id.* at 347 (quoting *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex.1995)). However, investigation of an incident alone is not enough to show that a governmental unit has actual knowledge of an injury. *Id.* "If a governmental unit is not subjectively aware of its fault, it does not have the same incentive to gather information that the statute is designed to provide, even when it would not be unreasonable to believe that the governmental unit was at fault." *Id.* at 347–48. The court recognized that, although "actual notice is a fact question when the evidence is disputed," it is, in many instances, a question of law. *Id.* at 348. The court also stated that subjective awareness may sometimes be proved by circumstantial evidence, but the subjective awareness must be *actual subjective awareness of its fault.* *Id.* (emphasis added).

On the same day that it decided *Simons,* the supreme court decided *University of Texas Southwestern Medical Center v. Loutzenhiser,* 140 S.W.3d 351 (Tex.2004). In *Loutzenhiser,* another section 101.101 notice case, the court held "that the plaintiff did not give notice within the six-month period as required, that lack of notice is a complete defense to suit but does not deprive the court of subject matter jurisdiction, and that the defendant did not waive its complaint of no notice by delaying to raise it." *Id.* at 354. Thus, under *Loutzenhiser,* lack of notice would have been asserted as a defense in a motion for summary judgment or some other pleading. It would not have been asserted in a plea to the jurisdiction. However, after the court decided *Loutzenhiser,* the legislature amended the Government Code to clarify the legislature's intent with regard to the relationship between statutory prerequisites to a suit and sovereign immunity.

The legislature added to section 311.034 of the Government Code the following language: "Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity." TEX. GOV'T CODE ANN. § 311.034 (Vernon Supp.2006). This amendment took effect on September 1, 2005.

■ TDCJ contends that it did not have notice as required under section 101.101, and that, therefore, the trial court did not have jurisdiction over appellees' complaint. Appellees respond that TDCJ had both statutory notice and actual notice of their claim. Appellees argue that the letter sent by their counsel to the warden of the Estelle unit was the formal notice of their claim as required by section 101.101(a).

Counsel's letter to the warden is not a notice of a claim by appellees against TDCJ. Although it refers to Hollimon's death (the damage or injury) and gives the date of the death at the Estelle Unit (the time and place), it does not describe the incident. Thus, the letter does not meet the requirements of section 101.101(a), but is merely a request for additional information regarding Hollimon's death.

Appellees contend that a letter from TDCJ's general counsel acknowledging receipt of appellees' letter and advising that the matter was being investigated and that the "releasability of information" would depend on the results of the investigation is a "clear and unequi[vocal] admission . . . that TDCJ may have fault" in the death of Hollimon. Appellees find additional evidence of TDCJ's subjective awareness of fault in a second letter from TDCJ stating that the information they were seeking was contained in "an on-going criminal investigation" and that TDCJ was unable to release any information at that time.

The fact that TDCJ investigated the circumstances of Holliman's death or that the Walker County District Attorney also investigated the death is not evidence that TDCJ had subjective awareness that it was at fault in that death. *See Simons,* 140 S.W.3d at 347–48 ("It is not enough that a governmental unit . . . did investigate . . . or that it should have known from the investigation it conducted that it might have been at fault. If a governmental unit is not subjectively aware of its fault, it does not have the same incentive to gather information that the statute is designed to provide . . . .").

Appellees' contention that the occurrence of an event provides actual notice if fault is obvious and an investigation is triggered is without merit. Appellees support this contention by quoting *Angleton Danbury Hospital District v. Chavana,* a pre-*Simons* case. 120 S.W.3d 424 (Tex. App.-Houston [14th Dist.] no pet.). Appellee's contention is in direct conflict with *Simons,* which states that "actual notice that an injury has occurred is not enough to satisfy section 101.101(c) [actual notice]."

Appellees' argument that the reprimand of a guard who was not at his station at the wing picket gate is evidence that TDCJ had subjective awareness of its fault is without support in the record. There is no evidence of whether, how, or why any TDCJ employee was reprimanded in connection with Hollimon's death. Likewise, there is no evidence that TDCJ had subjective awareness that it was at fault in Hollimon's injury or death.

Accordingly, we sustain TDCJ's issue regarding notice. Because the notice requirement is jurisdictional, we need not reach TDCJ's issue regarding sovereign immunity.

### Pierson's Appeal

In two issues, Pierson contends that her motion for summary judgment should have

been granted because (1) she did not violate Hollimon's rights under the Eighth Amendment and (2) she is entitled to qualified immunity. Because these issues are closely related, we consider them together.

Section 1983 creates a private right of action for violations of an individual's federally guaranteed rights by those acting under color of state law. *See Richardson v. McKnight,* 521 U.S. 399, 403, 117 S.Ct. 2100, 2103, 138 L.Ed.2d 540 (1997). The doctrine of qualified immunity shields an official performing discretionary functions from liability for civil damages under section 1983, provided the official's conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have been aware. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Thomas v. Collins,* 860 S.W.2d 500, 503 (Tex.App.-Houston [1st Dist.] 1993, writ denied). A legal right is "clearly established" when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

When a governmental official asserts the affirmative defense of qualified immunity by pleading good faith and demonstrating that his actions were within his discretionary authority, the burden shifts to the plaintiff to show that the defendant's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have been aware. *Thomas,* 860 S.W.2d at 503; *see also Whatley v. Philo,* 817 F.2d 19, 20 (5th Cir.1987). The plaintiff must show that (1) the official's conduct violated a federally guaranteed right, (2) the right was clearly established, and (3) the official's conduct was objectively unreasonable in light of the clearly established right. *Thomas,* 860 S.W.2d at 503. Objective reasonableness is a question of law for the court. *Hare v. City of Corinth,* 135 F.3d 320, 328 (5th Cir.1998); *see also Poteet v. Sullivan,* 218 S.W.3d 780 (Tex.App.-Fort Worth, 2007, pet. filed) (recognizing that objective reasonableness is matter of law).

An official is not liable for the failure to provide medical care to an inmate unless that failure was due to deliberate indifference to his medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). The test for determining deliberate indifference is subjective, not objective. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* To establish that an official acted with deliberate indifference, a plaintiff must prove that the official acted with subjective recklessness by consciously disregarding a substantial risk of serious harm. *Scott v. Britton,* 16 S.W.3d 173, 181 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (citing *Farmer,* 511 U.S. at 838–39, 114 S.Ct. at 1979–80). An official's failure to perceive and to alleviate a risk is not an infliction of punishment. *Id.* Moreover, negligent medical treatment is not a violation of section 1983. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.

In their second amended original petition, appellees asserted a claim against Pierson individually under section 1983, alleging that her actions violated Hollimon's Eighth Amendment rights. Appellees alleged that Pierson's failure to attempt cardiopulmonary resuscitation (CPR) on Hollimon cell-side or at the wing picket gate showed her conscious indifference to Hollimon's condition.

In her motion for summary judgment, Pierson asserted, among other things, that she was protected from appellees' claims by the doctrine of qualified immunity. She attached her own affidavit in which she asserted that her actions were taken in good faith. Her affidavit and that of Klean the Caruso, Director of Nursing, Medical/Surgical Services and TDCJ Hospital Nursing for UTMB, who had almost 20 years of experience in correctional nursing, established that Pierson's actions were within her discretionary authority. Caruso's affidavit also stated that she had reviewed the medical records of Hollimon, and that, based upon her training and experience, it was her opinion that Pierson's actions were appropriate, that there was no medical reason why pepper spray could not be used to subdue Hollimon, that Pierson could not have performed CPR cell-side because of the pepper spray in the air, that Pierson should not have attempted CPR in the absence of any personal protective equipment, that it was appropriate for Pierson to have Hollimon transferred to the medical unit for CPR, and that Pierson could not have anticipated the delay in getting Hollimon to the medical unit.

In response, appellees argued that Pierson's failure to attempt CPR was "wholly unreasonable" and reiterated the facts of the case. Appellees attached as summary judgment proof Caruso's affidavit; deposition excerpts of Pierson, Marc Rodriquez, a prison guard, and Dr. Sparks Veasey, the pathologist who performed the autopsy on Hollimon; and Pierson's affidavit. These attachments generally confirmed the facts as already stated.

In their brief, appellees state that from the cell to the medical department was "about a two minute trip" and that the group moving Hollimon waited "approximate[ly] five minutes ... for the gate to be unlocked." The record does not support these statements. When asked how long it would take to go from the cell to the medical department if one "just walked it," M. Rodriguez, one of the guards, answered, "Between a minute and a half, two minutes, two and a half minutes." However, the guards were not "just" walking the distance; they were carrying Hollimon, a well-developed, well-nourished, muscular man. Moreover, they did not begin their walk at 3:31 p.m. They brought Hollimon out of the cell and put him on the floor. Pierson then checked his carotid pulse, his pupils, his breathing, and his heartbeat, and, finding no response, directed the guards to take him to medical, "now." After the wing picket gate was opened, Hollimon was lifted onto a stretcher and taken to the medical department. There is no evidence in the record to establish how long the group waited for the gate to be unlocked, but it was clearly less than five minutes.

When asked how long they waited for the gate to be unlocked, Pierson answered, "I don't know how long it was. It didn't seem like very long." When asked why she did not give Hollimon CPR at the bottom of the stairs (at the gate), she responded, "I felt like it was probably better to get him on over to medical, right across the hall, with help." She testified that a person becomes brain dead after six minutes without oxygen. When asked if it took six minutes to get Hollimon from the cell to the medical department, she said, "I was not aware of the time element. All I can say is I remember it—it just didn't seem like it was long at all. It's just like it happened so fast."

Pierson's actions in checking Hollimon's vital signs and her reasons for not giving him CPR do not show subjective deliberate indifference to Hollimon's condition. Because appellees have not established that

Pierson acted with deliberate indifference, Pierson cannot be liable for the failure to provide medical care to Hollimon. *See Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. Moreover, considering her actions in the context of the deliberate-indifference standard, we hold that her decision not to give Hollimon CPR was not objectively unreasonable.

Because appellees have not proved that Pierson was deliberately indifferent to Hollimon's condition, they have not met their burden of rebutting Pierson's qualified-immunity defense. Accordingly, we sustain Pierson's issues.

## CONCLUSION

We reverse the trial court's order denying TDCJ's plea to the jurisdiction and render judgment dismissing appellees' claims against TDCJ for want of jurisdiction.

We reverse the trial court's order denying Pierson's motion for summary judgment and render judgment that appellees take nothing by their suit against Pierson.

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

This is a case brought by the estate and survivors of a young, strong, healthy, but mentally disturbed prison inmate, Damon Hollimon. When Hollimon, a paranoid schizophrenic, became agitated and violent, a five-man team of correctional officers of the Texas Department of Criminal Justice (TDCJ) assigned to transfer him to a psychiatric unit subdued him in his cell by repeatedly spraying him with O.C. pepper spray and, when that proved insufficient, throwing him face down on the floor, where four security personnel suited in protective gear secured his hands and feet, while another member of the team knelt on his neck until it broke. Hollimon's heart stopped, he quit breathing, and his eyes dilated and fixed.

The nurse assigned to approve the use of chemical restraint and to be on hand to provide medical assistance during the forced move, Glenda Pierson (Pierson), did nothing other than approve the use of the O.C. pepper spray, don a gas mask, record the events, and, after Hollimon was removed from his cell, take Hollimon's vital signs and discover that there were none. Pierson then continued to stand by and do nothing, other than to order that Hollimon be taken to the infirmary, for seven minutes while prison employees transported Hollimon, including a five minute delay to fetch a key to unlock an unattended locked wing picket gate between the cell block and the prison medical department. Pierson testified that she knew Hollimon needed cardiopulmonary resuscitation (CPR) as soon as he was taken out of his cell, but she did not give him mouth-to-mouth resuscitation because she would have had to remove her gas mask and the pepper spray would have disabled her. She subsequently did remove her mask, but she still did not attempt to give Hollimon CPR. CPR was attempted by medical personnel when Hollimon was taken into the infirmary, but Hollimon did not respond and was pronounced dead.

The majority holds that Appellee's suit against Appellants, TDCJ and Pierson, must be dismissed because TDCJ had no notice of Linda Thomas's claim and Pierson proved as a matter of law that she was not "deliberately indifferent" to the risk to Hollimon from failure to receive CPR and is thus entitled to official immunity from liability for the harm he sustained from not receiving CPR in time to save his life. In my view, the majority makes serious mistakes of law in deciding both issues. If its opinion is correct, the burden of proof

of notice is so high and the standard of proof of official immunity so low that it would be surprising if a suit could be maintained against any Texas state agency or Texas state employee under the Texas Tort Claims Act, the Texas Wrongful Death and Survival statutes, or section 1983 of the United States Code ever again, making the applicable statutes otiose. Therefore, I dissent.

I would affirm the trial court's denial of TDCJ's plea to the jurisdiction and Pierson's motion for summary judgment on her qualified immunity affirmative defense.

## TDCJ's Appeal

### Notice

The majority holds that TDCJ did not have notice of Thomas's claims as required for waiver of immunity under the Tort Claims Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.101 (Vernon 2005). Section 101.101, governing notice to a governmental entity for Tort Claims Act purposes, provides, in relevant part:

(a) A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:

(1) the damage or injury claimed;

(2) the time and place of the incident; and

(3) the incident.

. . . .

(c) The notice requirements provided or ratified and approved by Subsections (a) and (b) do not apply if the governmental unit has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged.

*Id.* If a party gives formal notice it must comply with the statutory requirements in subsection 101.101(a); when it gives no formal notice it must satisfy the requirements of actual notice, as provided by subsection 101.101(c). *See id.*

The majority holds that TDCJ had neither actual notice of Thomas's claims, in satisfaction of section 101.101(c), nor formal notice, in satisfaction of section 101.101(a). I would hold that it had both.

### Actual Notice

Hollimon died while being chemically restrained, forcibly removed from his cell, and transported to the prison infirmary by correctional staff of the Estelle Unit attended by a nurse employed by the prison to provide medical treatment to prisoners in the unit. He was pronounced dead by Estelle Unit medical personnel. An autopsy was performed on Hollimon's body and disclosed that the cause of death was asphyxiation. Each of the TDCJ employees involved in the incident of chemically and forcibly restraining Hollimon and in moving him to the infirmary where he was pronounced dead was required to write a report about the incident. An investigation was performed by TDCJ, and a criminal investigation into Hollimon's death was launched by the Walker County District Attorney.

The majority reasons that, nevertheless, TDCJ did not have actual notice under subsection 101.101(c) because it did not have "actual subjective awareness" of Hollimon's claims, as required to satisfy section 101.101(c). The majority cites as authority for its conclusion *Texas Department of Criminal Justice v. Simons*, 140 S.W.3d 338 (Tex.2004), which, it states, settled the issue of what constitutes "actual notice" under section 101.101(c). In my view, the majority opinion misconstrues the actual notice requirements for satisfaction of subsection 101.101(c) set out in *Simons*.

*Simons* defines "actual notice" to a governmental unit for purposes of section 101.101(c) as "knowledge of (1) a death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved." *Simons,* 140 S.W.3d at 344.

The rationale for the supreme court's interpretation of the actual notice requirement of section 101.101(c) in *Simons* is instructive. *Simons* was decided to settle a dispute among the courts of appeals over how much evidence was required to establish that a governmental unit sued under the Tort Claims Act had actual notice of the claim. The dispute arose in the wake of *Cathey v. Booth,* 900 S.W.2d 339 (Tex. 1995) (per curiam). In *Cathey,* the Booths had sued a county hospital alleging that the hospital's negligent diagnosis and treatment of the wife's obstetric condition resulted in the stillborn birth of their child. *Cathey,* 900 S.W.2d at 340. They gave no *formal* notice of their claim to the hospital under subsection 101.101(a); and they argued that subsection (c) relieved them of any need to give *any* notice of their claim to the hospital because the hospital had *actual* notice that injury and death had occurred. *Id.* at 341.

The supreme court, in *Cathey,* rejected the Booths' argument that actual knowledge that a patient has received treatment at a governmental hospital or has died after receiving treatment is sufficient to constitute notice to the hospital that it might be sued under the Tort Claims Act. *Id.* It observed that such an interpretation of subsection 101.101(c) would be "the equivalent of having no notice requirement at all because the hospital would be required to investigate the standard of care provided to each and every patient that received treatment." *Id.* The court held that a governmental unit is entitled to receive formal, written notice of a claim against it within six months of the incident from which the claim arises unless it has actual notice of the claim, including knowledge of its "alleged fault producing or contributing to the death, injury, or property damage." *Id.*

The language in *Cathey* led to confusion, however, over the proof required to establish actual notice of a potential claim against a governmental unit under section 101.101(c). That was the issue addressed in *Simons,* and the supreme court's resolution of the standard was clear:

Actual notice may be imputed to a governmental unit when its fault is obvious or an agent charged with a duty to investigate and report to the unit receives notice of the three *Cathey* elements.[1] Thus, an incident that triggers an investigation and accident report will impute such notice where there is evidence to connect the accident to an action or omission by the governmental unit such that it should have known of its potential culpability....

....

*Actual notice is imputed to a governmental entity if it, or one of its agents, is aware of facts and circumstances surrounding an accident sufficient to put them on inquiry that, if pursued, would reveal its alleged or possible fault producing or contributing to the injury. Governmental entities have actual notice to the extent that a prudent entity could ascertain its potential liability stemming from an incident, either by*

---

1. "(1) [A] death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved." *Simons,* 140 S.W.3d at 344.

*conducting a further investigation or because of its obvious role in contributing to the incident.*

. . . .

What we intended in *Cathey* by the second requirement for actual notice [the governmental unit's alleged fault] was that a governmental unit have knowledge that amounts to the same notice to which it is entitled by section 101.101(a).

*Simons,* 140 S.W.3d at 346–47 (emphasis added).

In my view, it cannot rationally be claimed that TDCJ did *not* have notice that Hollimon's death had occurred and of its own involvement in that death when (1) his death occurred in the Estelle Unit at the time TDCJ employees were chemically and forcibly restraining him in his cell and transporting him to the prison infirmary; (2) TDCJ ordered an autopsy performed on his body, which showed a broken neck and death from asphyxiation; (3) all involved TDCJ personnel were required to write reports on the death; (4) TDCJ conducted an investigation of the death; and (5) the Walker County District Attorney, likewise, opened a criminal investigation into the death.

The facts and circumstances under which actual notice is imputed to a governmental entity *as a matter of law* are fully realized in this case. Information sufficient to impute actual notice of Thomas's claims to TDCJ arises not only from TDCJ's "obvious role in contributing to" Hollimon's death, which occurred while he was being chemically and physically subdued and transported and monitored by TDCJ personnel, but also from the autopsy TDCJ ordered, the reports it solicited, the internal investigation it performed, and the Walker County District Attorney's criminal investigation into the circumstances of Hollimon's death. TDCJ thus had ample evidence to connect Hollimon's death to acts and/or omissions by TDCJ employees such that, if further pursued, a prudent entity could have ascertained its potential liability stemming from the death. *See Simons,* 140 S.W.3d at 346.

Accordingly, I would hold that TDCJ had actual notice of Hollimon's death and of circumstances attendant on that death that implicated TDCJ employees in potentially actionable acts and omissions.

*Formal Notice*

I would also hold that the June 12, 1998 letter constituted formal notice under section 101.101(a), even though formal notice was not required under the circumstances of this case due to TDCJ's actual notice of the facts giving rise to its potential liability. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.101(c).

On June 12, 1998, four months after Hollimon's death, an attorney representing appellees Linda Thomas, personal representative of Hollimon's estate, and Hollimon's daughter Ashley wrote to the warden of the Estelle Unit as follows:

I write this letter on behalf of the surviving daughter, and the personal representative of the Estate of Damon L. Hollimon. Ashley D. Hollimon, a minor, is the sole surviving child of Damon L. Hollimon. Linda Thomas, Ashley's mother, is the personal representative of the Estate of Damon L. Hollimon. Please see attached Affidavit of Personal Representative, Affidavit of Heirship, and Death Certificate of Damon L. Hollimon.

As evidenced by the Death Certificate, Mr. Hollimon died of asphyxiation on February 18, 1998, while an inmate at the Estelle Unit of the Texas Department of Corrections.

At this time, I request copies of medical records, investigative reports, and

video tapes relating in any way to the death and the circumstances surrounding the death of Mr. Hollimon. If there is a charge for these documents, please advise.

On February 12, 1999, Thomas, as personal representative for the estate of Damon Hollimon deceased,[2] sued TDCJ, its executive director, the warden of the Estelle Unit, and unnamed prison guards, asserting causes of action under the Texas Tort Claims Act,[3] Wrongful Death and Survival statutes,[4] and section 1983 [5] for violations of civil rights.

Even though the majority acknowledges that the June 12, 1998 letter "refers to Hollimon's death (the damage or injury) and gives the date of the death at the Estelle Unit (the time and place)," it concludes that it does not constitute formal notice of appellees' claims because "it does not describe the incident." Thus, the majority reasons that TDCJ could read the letter and still not have "a subjective awareness that its fault produced or contributed to the claimed injury." I disagree.

First, section 101.101(a) requires only that the notice "reasonably describe" the damage or injury claimed, the time and place of the incident, and the incident itself so that the governmental unit may identify the incident and its alleged involvement in it. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.101(a); *Simons,* 140 S.W.3d at 343. The incident referenced in the June 12, 1998 letter is Hollimon's death "by asphyxiation on February 18, 1998 while an inmate at the Estelle Unit of the Texas Department of Corrections." Under the circumstances of this case, it is inconceiva-

ble that TDCJ did not know to which incident the letter was referencing or whether its employees were allegedly involved when it received a letter from an attorney stating that he represented Hollimon's estate and survivors.

Moreover, it is clear that the letter portends a potential claim by Hollimon's estate and heirs against TDCJ based on the actions of its employees in contributing to Hollimon's death on February 18, 1998. First, a statement that a specific claim is going to be filed is *not* required for formal notice of a claim by section 101.101(a). Second, the June 12, 1998 letter was from appellees' attorney to the warden of the Estelle Unit. The letter stated, "I request copies of medical records, investigative reports, and video tapes relating in any way to the death and the circumstances surrounding the death of Mr. Hollimon. If there is a charge for these documents, please advise." Such a statement in a letter to the head of a governmental unit, namely a prison, from an attorney who identifies himself as representing the survivors and estate of an inmate who died while being chemically and forcibly subdued and moved by prison employees could not have reasonably have been interpreted by the general counsel to TDCJ, to whom the warden referred the letter, as anything other than notice of impending litigation by Hollimon's estate and survivors that triggered TDCJ's duty to retain documents relevant to the incident and the work product exemption for investigations made in anticipation of litigation. *See* TEX.R. CIV. P. 192.3(a), (b), 192.5(a). Any other inference drawn by TDCJ's counsel

---

2. During the pendency of this lawsuit, Ashley Dominique Hollimon reached her majority and joined the suit in her individual capacity.

3. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.001–109.007 (Vernon 2005).

4. *See id.* §§ 71.001–71.051 (Vernon 2005).

5. *See* 42 U.S.C. § 1983 (Civil Rights Act of 1964).

would have been below the standard of professional care of reasonably competent counsel. Thus, in my opinion, the June 12, 1998 letter and the attached death certificate "reasonably described" events sufficiently known to TDCJ to put it on notice of the damage or injury claimed, the time and place of the incident, and the potential liability for claims arising out of that incident.

The majority opinion reintroduces all the confusion *Cathey* and *Simons* were designed to lay to rest—and which, until now, they had indeed laid to rest.[6] I would hold that actual notice of Hollimon's death and its potential liability can be imputed to TDCJ as a matter of law, and I would overrule appellants' plea to the jurisdiction based on lack of notice. I would, therefore, address the merits of the trial court's denial of TDCJ's plea to the jurisdiction.

### Use of Tangible Property

In two issues, TDCJ argues that appellees' claims against it under the Tort Claims Act should be dismissed because its sovereign immunity was not waived by section 101.021(2) of the Texas Civil Practice and Remedies Code[7] in that the injury to Hollimon was not caused by the "use" of tangible property, *i.e.*, the pepper spray or wing picket gate, as alleged by appellees. Rather, TDCJ contends that appellees failed to raise a fact issue on the required causal link between the condition or use of property and the harm to Hollimon, which

is required for waiver of immunity under the Tort Claims Act and thus for subject matter jurisdiction; therefore, this Court should dismiss appellees' claims against it for lack of subject matter jurisdiction.

Section 101.021 of the Tort Claims Act provides, in relevant part:

A governmental unit in the state is liable for:

(1) property damage ... proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

. . . .

(B) the employee would be personally liable to the claimant according to Texas law. . . .

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

Tex. Civ. Prac. & Rem.Code Ann. § 101.021 (Vernon 2005). The term " 'use' means 'to put or bring into action or service; to employ for or apply to a given purpose.' " *Texas Natural Res. Conservation Comm'n v. White,* 46 S.W.3d 864, 869 (Tex.2001).

Appellees pled that TDCJ's decision to spray Hollimon three times with O.C. pepper spray caused him to cough and to have difficult time breathing and was thus a

---

6. The majority relies on dictum from *Simons* stating that actual notice is not triggered *"merely* by [an agency's] conducting an investigation, or even by obtaining information that would reasonably suggest its culpability." *Simons,* 140 S.W.3d at 348 (emphasis added). This language was in response to TDCJ's argument in *Simons* that if merely investigating an incident counted as notice it would have "a perverse incentive to ignore every incident until receives formal notice of a claim." *Id.* It does not in any sense undermine the appli-

cability here of the supreme court's holding in *Simons* that "[g]overnmental entities have actual notice to the extent that a prudent entity could ascertain its potential liability stemming from an incident, either by conducting a further investigation or because of its obvious role in contributing to the incident." *Id.* at 346–47.

7. Tex. Civ. Prac. & Rem.Code Ann. § 101.021(2) (Vernon 2005).

proximate cause of his subsequent death by asphyxiation. They also pled that the locked wing picket gate caused a delay of five minutes in getting Hollimon from his cell to the infirmary, causing him to suffer irreversible brain injury from lack of oxygen. Their pleadings are supported by the evidence.

Hollimon was described by clinical personnel immediately before the forced cell move as "out of it . . . his eyes were wild, he had food in his mouth that was falling out, and was shouting obscenities . . . words could not reach him." Pierson testified that Hollimon was coughing and having difficulty breathing with each application of the pepper spray but continued verbalizing. The testimony about the manner in which Hollimon was subdued and the timing is unrefuted. It is also unrefuted that Hollimon received no oxygen or CPR from the time he was taken out of his cell at 3:31 p.m. until he reached the infirmary at 3:38 p.m. He was pronounced dead at 4:15 p.m. There was also unrefuted testimony that the trip from Hollimon's cell to the infirmary would normally take one and one-half to two and one-half minutes, but because the wing picket gate was locked and unattended, it was necessary to find a guard to unlock the gate, causing a delay of approximately five minutes. There was unrefuted testimony that irreversible brain death occurs in five or six minutes.

Dr. Sparks Vesey, the TDCJ pathologist who conducted the autopsy on Hollimon, testified that the effects of pepper spray include irritation to the throat, coughing, and shortness of breath. He further testified that a person develops irreversible brain injury in about four and one-half to five minutes if he is not breathing and is not getting oxygen and that Hollimon would have suffered irreversible brain injury by the time the TDCJ personnel got him to the infirmary. He also testified that the hyoid bone at the back of Hollimon's throat was broken, but that a fracture of the hyoid bone "in and of itself, won't kill you."

Pierson testified to Hollimon's coughing after each spraying. She also testified that she did not give CPR to Hollimon even though she knew that his lack of vital signs indicated a need for CPR. She also testified that a person who is not breathing suffers irreversible brain death in six minutes.

Dr. Edward Gripon, appellees' expert, testified by affidavit that Hollimon's inability to breath was a proximate cause of his death by asphyxiation.[8] He further testified that the use of the chemical agent that caused Hollimon to cough repeatedly would have been a proximate cause of his asphyxiation, which caused his ultimate death.

For immunity to be waived by section 101.021(2) of the Civil Practice and Remedies Code, personal injury or death must have been proximately caused by the condition or use of tangible property. *Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998); *Bonham v. Texas Dep't of Criminal Justice*, 101 S.W.3d 153, 157–58 (Tex.App.-Austin 2003, no pet.). To be a proximate cause of injury, the negligent conduct must involve some condition or use of the tangible property. *Bonham*, 101 S.W.3d at 158. Waiver of immunity for personal injury caused by the use of tangible personal or real property extends to all injuries proxi-

---

8. Dr. Gripon is a physician board-certified by the American Board of Psychiatry and Neurology in psychiatry and a diplomat of the American Board of Psychiatry and Neurology with additional qualification in forensic psychiatry. He reviewed documentation, including medical records, reports, affidavits, and deposition testimony.

mately caused by the use or misuse of the property, rather than just to those injuries proximately caused by the property itself. *See Texas Dep't of Mental Health and Retardation v. Petty,* 848 S.W.2d 680, 682–83 (Tex.1993); *see also Michael v. Travis County Hous. Auth.,* 995 S.W.2d 909, 913 (Tex.App.-Austin 1999, no pet.). However, the condition or use of the property must not be too attenuated from the injury to be said to have caused it. *See Bossley,* 968 S.W.2d at 343.

Sovereign immunity is waived under section 101.021(2) when a governmental unit "has provided property that lacks an integral safety component and the lack of this integral component led to the plaintiff's injuries." *Bossley,* 968 S.W.2d at 343 (quoting *Kerrville State Hosp. v. Clark,* 923 S.W.2d 582, 585 (Tex.1996)); *Michael,* 995 S.W.2d at 914–15 (immunity waived by housing authority responsible for inspecting and maintaining fence where pit bulls escaped through holes in fence and attacked passing children); *see also Robinson v. Central Tex. MHMR Ctr.,* 780 S.W.2d 169 (Tex.1989) (immunity waived by mental health facility that had failed to provide life preserver for epileptic patient who died while swimming); *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297 (Tex.1976) (immunity waived by university that failed to provide proper safety equipment for football player leading to knee injury); *Overton Mem'l Hosp. v. McGuire,* 518 S.W.2d 528 (Tex.1975) (per curiam) (immunity for personal injuries suffered by patient who fell out of bed waived by hospital that provided hospital bed without rails). Property does not cause injury, however, "if it does no more than furnish the condition that makes injury possible." *Bossley,* 968 S.W.2d at 343 (causation too attenuated and, therefore, immunity not waived by mental health facility for death of patient who escaped through unlocked doors, ran half a mile to freeway, and committed suicide by throwing himself in front of truck).

Here, appellees have pled that the repeated use of pepper spray by TDCJ personnel on Hollimon, who had food in his mouth, causing him to cough and have difficulty breathing as he was forcibly restrained and subdued by five masked guards, was directly related to his ensuing death from asphyxiation, and they substantiated their claims with summary judgment evidence of the interference of the pepper spray with Hollimon's breathing. These allegations and evidence are sufficient to state a claim that the use of the pepper spray was a proximate cause of Hollimon's death by asphyxiation.

Nor can it be said that the locked wing picket gate merely furnished the condition for an unrelated or attenuated injury to Hollimon. Rather, the purpose of the locked gate was clearly to prevent persons from leaving the area of the cells, and the purpose of having a guard at the locked gate was clearly to permit passage in emergency or other appropriate situations. The gate was, nevertheless, left locked and unattended. It directly impeded Hollimon's being taken to the infirmary for CPR during the critical time for resuscitation. All of the evidence related to TDCJ's plea to the jurisdiction supports the inference that the delay of approximately five minutes by TDCJ personnel in getting CPR to Hollimon in the infirmary directly caused the impossibility of his resuscitation, because brain death was inevitable during that lapse of time. I would hold, therefore, that the unattended locked gate between the prison cells and the infirmary during the time Hollimon was being chemically and physically restrained by TDCJ personnel for forcible transfer out of the unit constituted a condition or use of tangible real property that delayed his receiving medically necessary CPR for ap-

proximately five minutes and, therefore, proximately caused his irreversible brain death.

This case is distinguishable from *Bossley,* in which an unlocked door through which a mental patient escaped was deemed by the supreme court to be too attenuated a cause to be a proximate cause of the patient's suicide by throwing himself in front of cars on a highway half a mile away. *See* 968 S.W.2d at 341, 343. Rather, it is virtually identical to *Michael,* in which the Travis County Housing Authority was found to have waived immunity for personal injuries suffered by the plaintiff children when pit bulls escaped through holes in a fence that it maintained and attacked them. *See* 995 S.W.2d at 911–12. Here, TDCJ was responsible for the locked condition of the winged picket gate, which directly caused the five minute delay in getting CPR for Hollimon that made his brain death inevitable.

I would overrule TDCJ's issues on causation.

### Pierson's Appeal

The majority also dismisses appellees' civil rights claims against Pierson in her personal capacity under Title 42, section 1983 of the United States Code. Again, I dissent.

As the majority states, section 1983 creates a private right of action for civil damages for violations of federal law by persons acting under color of state law. *See* 42 U.S.C. § 1983; *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 82, 104 S.Ct. 892, 896–97, 79 L.Ed.2d 56 (1984). However, the doctrine of qualified immunity shields an official performing discretionary functions from liability under section 1983, provided the official's conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have been aware.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Thomas v. Collins,* 860 S.W.2d 500, 503 (Tex.App.-Houston [1st Dist.] 1993, writ denied).

The treatment a prisoner receives in prison is subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). The Eighth Amendment imposes duties on prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care," and to " 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' " *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977.

Not every injury suffered by a prisoner translates, however, into liability for prison officials responsible for the victim's safety. *Id.* Rather, a prison official violates the Eighth Amendment only when two requirements are met. *Id.* First, for a claim based on a failure to prevent harm, like that against Pierson, the plaintiff must show that the inmate was incarcerated under conditions posing a substantial risk of harm. *Id.* In addition, the plaintiff must show that the official's state of mind was one of " 'deliberate indifference' to inmate health or safety." *Id.; see also Scott v. Britton,* 16 S.W.3d 173, 181 (Tex.App.-Houston [1st Dist.] 2000, no pet.). "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer,* 511 U.S. at 835, 114 S.Ct. at 1978. "[A] prison official cannot be found liable under the Eight Amendment for denying an in-

mate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. at 1979; *see Scott*, 16 S.W.3d at 181. Proof of deliberate indifference thus requires a showing of subjective recklessness, *i.e.*, a showing of conscious disregard of a substantial risk of serious harm. *See Farmer*, 511 U.S. at 839, 114 S.Ct. at 1980; *Scott*, 16 S.W.3d at 181.

Under United States Supreme Court authority, "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981. It remains open to prison officials charged with deliberate indifference, however, to show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S.Ct. at 1982.

Pierson was a registered nurse employed by the University of Texas Medical Branch Correctional Managed Care (UTMB/CMC). Her responsibilities included providing medical treatment to inmates incarcerated in the Estelle Unit of TDCJ. On February 18, 1998, she was assigned to approve the use of chemical restraint and to monitor the safety of Hollimon's treatment during the chemical restraint and forced transfer from his cell to the psychiatric section of the Estelle Unit. Prison policy required that a nurse be present when chemical agents were used by correctional staff and when they planned to conduct a forced cell move of a prisoner from his cell. The purpose of this policy can only have been to ensure compliance with safety standards required by the Eighth Amendment.

Pierson had been in the nursing program all of her professional life and had been involved with emergency medical situations since 1991. She testified that she was well trained in what to do in emergency medical situations. The duties she performed in connection with Hollimon's forced transfer from his cell included giving medical clearance for the use of chemical agent O.C. pepper spray, monitoring the procedure, timing the spraying with her watch, and noting in her medical notes the precise time of each spraying (3:22 p.m.; 3:24 p.m.; and 3:26 p.m.) and the effect the chemical agent had on Hollimon each time. Pierson also observed, and duly recorded, the five man team's entry into Hollimon's cell at 3:28p.m., immediately after the repeated pepper spraying, and his being forcibly subdued and handcuffed, carried outside the cell, and lain on the floor. She noted the time in her chart at 3:31p.m.

After noting the time Hollimon was removed from his cell, Pierson immediately noted that his neck was limp and his head was "wobbly" and uncontrolled. She took Hollimon's vital signs and found he had no carotid pulse, his pupils were fixed and dilated 4–5mm., he had no heartbeat, and he was not breathing. The mere fact that Pierson was assigned these duties necessarily evinces TDCJ's and Pierson's acknowledgment that the use of chemical restraint and physical force on a disoriented and psychotic prisoner presents "conditions posing a substantial risk of ser-

ious harm." *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977.

Pierson admitted in her deposition that she knew that Hollimon's condition when he was carried out of his cell with a "wobbly" neck and without vital signs indicated a need for CPR, but she did not administer CPR because she was afraid to remove her gas mask for fear of being incapacitated. Indeed, Pierson testified that her check of Hollimon's vital signs told her Hollimon was not breathing and "that's an indication for CPR." Nevertheless, her only action was to order the correctional staff to take Hollimon to the infirmary.

The only reasonable inference for Eighth Amendment and section 1983 purposes is that Pierson knew and consciously disregarded the very substantial risk that if Hollimon were not given CPR immediately he could not be resuscitated. And, again, Pierson herself admitted in an affidavit made an exhibit to her own motion for summary judgment that "it was obvious to me that he was in serious distress—I fully appreciated the nature of his condition. . . ." Moreover, even if Pierson initially calculated that the medical team had time to get Hollimon to the infirmary before CPR was performed, she was necessarily disabused of that notion when the wing picket gate out of the unit was locked and a guard had to be found to unlock it. Pierson also testified that she knew that a patient becomes brain dead after six minutes without breathing.

Given Pierson's training as a nurse, her extensive experience in emergency medical situations, her observations of Hollimon's condition, the careful notes she took about the precise timing and effect of each event during the chemical restraint and physical subduing of Hollimon, and her explicit avowal that she appreciated the nature of his condition and knew CPR was indicated and that brain death would occur in six minutes, it is unreasonable to infer that Pierson had *no* subjective awareness of facts from which the inference could be drawn that the failure to give Hollimon CPR when he was removed from his cell posed a substantial risk of serious harm to Hollimon and that the risk was augmenting with every moment of delay in getting him to the infirmary. It is also unreasonable to infer that Pierson failed to draw the inference that her failure to give CPR to Hollimon or to obtain CPR for him posed a substantial risk of serious harm to him. *See Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979. Yet Pierson consciously disregarded the risk to Hollimon's health and safety and made no effort whatsoever to get him the treatment necessary to resuscitate him by taking off her own gas mask to give him CPR, by working in tandem with the moving team to save him, or by doing anything else that her extensive training and experience in emergency medical situations would have alerted her to do. Indeed, she still failed to give him CPR even after she judged it safe to remove her gas mask and after she found the winged picket gate locked.

It is difficult for me to imagine what else it would take to establish Pierson's "deliberate indifference" to Hollimon's health or safety under the standard of proof established by the Supreme Court in *Farmer*. *See* 511 U.S. at 834, 114 S.Ct. at 1977. Pierson is not in a position to argue that she "did not know of the underlying facts indicating a sufficiently substantial danger and that [she was] therefore unaware of a danger, or that [she] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S.Ct. at 1982. Indeed, the record conclusively establishes the opposite. Therefore, I would hold, as a matter of law, that Hollimon was restrained and

transported to the prison infirmary under conditions posing a substantial risk to his health and safety, that Pierson appreciated the risk, and that her state of mind was one of deliberate indifference under the applicable legal standard, as proved by the summary judgment evidence in the case. *See id.* at 834, 114 S.Ct. at 1977.

The majority, however, weighs appellees' evidence of deliberate indifference, namely, Pierson's failure to attempt CPR on Hollimon beside his cell or at the locked wing picket gate, against the movant's, Pierson's, affidavit that she acted in good faith and the opinion testimony from Pierson's colleague that Pierson's actions were appropriate, and it holds that Pierson established her entitlement to summary judgment on her affirmative defense of qualified immunity. The majority thus treats the proof of deliberate indifference not as a matter to be determined in accordance with the standard set out in *Farmer* but as a swearing match between the defendant's (movant's) witnesses and the plaintiffs' (non-movant's), with the appellate court as factual referee charged with determining whether appellees, as *nonmovants*, established deliberate indifference as a matter of law. This is the wrong standard of proof of deliberate indifference, not only under section 1983 but also under Texas summary judgment law.

A defendant is entitled to summary judgment on the affirmative defense of qualified immunity if she conclusively establishes all elements of her affirmative defense as a matter of law. *Fowler v. Szostek,* 905 S.W.2d 336, 340 (Tex.App.-Houston [1st Dist.] 1995, no pet.). The nonmovant must then expressly present to the trial court any reasons in avoidance of the movant's entitlement to summary judgment, together with summary judgment proof when necessary to establish a fact issue. *Id.* Summary judgment is re-

viewed de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). The reviewing court takes as true all evidence favorable to the nonmovant; and it indulges every reasonable inference and resolves any doubt in the nonmovant's favor. *Id.*

I would hold that Pierson failed to prove her affirmative defense of qualified immunity because she did not prove as a matter of law that she was not deliberately indifferent to the risk to Hollimon's health and safety. Indeed, under the standard of proof of deliberate indifference set out in *Farmer* and adopted by this Court in *Scott,* the summary judgment proofs establish the contrary, namely, Pierson's deliberate indifference to Hollimon's health and safety.

### Conclusion

I would affirm the trial court's orders denying TDCJ's plea to the jurisdiction and Pierson's motion for summary judgment.