Opinion issued July 31, 2014



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00391-CV

———————————

**DELORES ESCOBAR, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF LUIS MANUEL ESCOBAR, AND AS NEXT FRIEND OF LUIS ALBERTO ESCOBAR, A MINOR, Appellant**

**V.**

**HARRIS COUNTY, TEXAS AND ERIC GOODNEY, Appellees**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-62746**

---

## O P I N I O N

Following an attempted traffic stop, Luis Manuel Escobar fled in his car from Harris County Sheriff's Deputy Eric Goodney. At the end of the pursuit, Luis was shot and killed as he ran from the scene. This lawsuit was brought by Luis's

mother, alleging that his death resulted from the unlawfully excessive use of force by Deputy Goodney.

Appellant Delores Escobar sued appellees Harris County and Deputy Eric Goodney for wrongful death and for violation of 42 U.S.C. § 1983. Both defendants moved for summary judgment. The County pleaded governmental immunity and Deputy Goodney pleaded qualified immunity. The trial court granted summary judgment on all claims except the wrongful-death claim against the County. However, the court subsequently granted a plea to the jurisdiction dismissing that remaining claim, resulting in a final take-nothing judgment on all claims.

On appeal, since Escobar pleaded facts that amount to an intentional tort, we affirm the trial court's order granting the County's plea to the jurisdiction as to the wrongful-death claim. And because Escobar did not produce evidence to raise an issue of material fact on a theory of liability that would otherwise render the County liable for Deputy Goodney's actions, we also affirm the trial court's order granting summary judgment for the County. However, because the evidence presents genuine issues of material fact as to whether Deputy Goodney used unconstitutionally excessive force and whether his actions were shielded by qualified immunity, we reverse the summary judgment granted in his favor, and we remand the claims against him for further proceedings.

## Background

This is an appeal from a grant of summary judgment, and accordingly our recitation of the facts reflects the record as viewed in the light most favorable to the nonmovant plaintiff. *See City of Keller v. Wilson*, 168 S.W.3d 802, 824–25 (Tex. 2005); *cf. Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam).

Deputy Eric Goodney was driving his Harris County Sheriff's Office patrol car when he noticed Luis Escobar speeding. Deputy Goodney initiated a traffic stop by turning on his lights and siren, but Luis did not pull over, instead continuing to drive at a "high rate of speed." After a pursuit of about a minute traveling southbound on Veterans Memorial Drive, Luis crashed into another car at the intersection with Antoine Drive. Luis's car lost control, struck several other vehicles, spun around, and came to a stop.

Deputy Goodney parked his car hood-to-hood with Luis's black Impala. Luis exited and began to run toward the rear of his car and away from Deputy Goodney. He was hindered by baggy pants that were falling down from his waist, and he tried to hold them up as he fled. Deputy Goodney, who had gotten out of his cruiser, initially fired three shots as Luis tried to flee. Luis continued running away, passing into the driveway of a nearby Walgreens pharmacy. Deputy Goodney fired three more shots, all of which struck Luis from behind. Luis collapsed and died at the scene. Deputy Goodney contends that he fired his weapon

in fear for his personal safety after seeing Luis reach into his waistband where a weapon could have been concealed, but no weapon was recovered from Luis's body.

The Internal Affairs Division of the Harris County Sheriff's Office investigated the incident. As part of the investigation, officers examined the crime scene, interviewed Deputy Goodney and other witnesses, and prepared a report for the Administrative Discipline Review Committee of the Sheriff's Office. That committee reviewed the facts, credited Deputy Goodney's account that he feared for his safety, and found that the use of deadly force was justified. As a consequence, Deputy Goodney was not disciplined.

Luis's mother, Delores Escobar, filed suit against both Deputy Goodney and his employer, Harris County.[1] She alleged claims for wrongful death and under section 1983 for violation of Luis's Fourth Amendment right to be free from seizure by excessive force.

---

[1]    The lawsuit was filed by Escobar in her individual capacity, as representative of the estate of her son Luis Manuel Escobar, and as next friend of her grandson Luis Alberto Escobar. While the parties have made some references to an amended petition filed in the trial court, only the original petition is included in the appellate record. No party has argued that any amendment to the petition has any materiality to the issues presented on appeal, and accordingly all references in this opinion to the "petition" are to Escobar's original petition.

Both defendants sought summary judgment. Deputy Goodney's motion argued that the suit should be dismissed because Luis's constitutional rights had not been violated, and also on grounds of qualified immunity. The trial court granted summary judgment in favor of Deputy Goodney without specifying its reasons.

The County also filed a motion for summary judgment. It argued that there was no legal basis to hold the County liable for Deputy Goodney's actions, and also that it was immune from the wrongful-death claim. Without stating its reasons, the trial court granted summary judgment on the civil-rights claim against the County but denied summary judgment as to the wrongful-death claim. The County then filed a plea to the jurisdiction directed at the wrongful-death claim, which the trial court granted. The order disposed of all outstanding claims; Escobar appealed.

**Analysis**

Escobar contends that the County's plea to the jurisdiction on grounds of governmental immunity was improperly granted, asserting that her claims are for negligence, and that they are therefore cognizable under the Texas Tort Claims Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109 (West 2011). She further argues that summary judgment should not have been awarded in favor of Deputy Goodney, reasoning that the evidence before the trial court was sufficient

to create a genuine issue of material fact as to whether he used constitutionally excessive force and whether his actions were sheltered by qualified immunity. Finally, she submits that her section 1983 claim against the County should not have been resolved by summary judgment. She insists that there was adequate evidence to support each of several theories of the County's liability for use of excessive force by a law enforcement officer.

## I.   County's governmental immunity as to wrongful-death claim

In her second appellate issue, Escobar argues that the trial court should not have granted the County's plea to the jurisdiction because governmental immunity from her wrongful-death claim has been waived by the Tort Claims Act. She emphasizes that she alleged negligence, not an intentional tort.

A plea to the jurisdiction is a challenge to the subject matter jurisdiction of the court hearing the case. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). A court cannot decide a case in the absence of subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993). As subject matter jurisdiction will not be presumed, the plaintiff has the burden of pleading facts to establish its existence. *Id.* at 443–44, 446.

"Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed de novo. Likewise, whether undisputed evidence of jurisdictional facts establishes a trial court's

jurisdiction is also a question of law." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We look only to the plaintiff's pleadings and the evidence pertinent to the jurisdictional inquiry while eschewing examination of the merits of the case. *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002).

Texas counties enjoy governmental immunity from suit which, to the extent it applies, deprives a court of its subject matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). The Tort Claims Act, however, waives a county's governmental immunity in certain cases. *Id.* It provides:

> A governmental unit in the state is liable for:
>
> (1)   property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
> (A)   the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
>
> (B)   the employee would be personally liable to the claimant according to Texas law; and
>
> (2)   personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021. The Act further provides that no waiver of immunity is made for any claim "arising out of assault, battery, false imprisonment, or any other intentional tort." *Id.* § 101.057. To the same extent that

7

the Tort Claims Act waives governmental immunity from liability, it also waives immunity from suit. *Id.* § 101.025.

Escobar alleged negligent conduct on the part of the County. She claimed in her petition that the County negligently supervised and trained Deputy Goodney. She also alleged that the County's negligence involved the use of tangible property, specifically, Deputy Goodney's firearm. She thus contends that the waiver for death caused by tangible personal property applies in this case. *See id.* § 101.021(2).

This court considered and rejected an almost identical argument in *Harris County, Texas v. Cabazos*, 177 S.W.3d 105 (Tex App.—Houston [1st Dist.] 2005, no pet.). In *Cabazos*, the plaintiff was shot by a law enforcement officer. 177 S.W.3d at 107. The plaintiff contended both that Harris County had been negligent in training and supervising the officer, who himself had been negligent in making an arrest and using his firearm. *Id.* at 112. This court held that the pleadings and record in that case demonstrated that the shooting was an intentional act by the officer. *Id.* at 112–13. The court rejected the plaintiff's characterization of his claim as one for negligence, treating it as an improper attempt to circumvent the intentional-torts exception of the Tort Claims Act. *See id.* at 112–13. The court explained, "If a plaintiff pleads facts which amount to an intentional tort, no matter

if the claim is framed as negligence, the claim generally is for an intentional tort and is barred by the TTCA." *Id.* at 111.

Escobar's argument—that her claim alleges negligent conduct, not an intentional tort—is the same as the one rejected in *Cabazos*. It is undisputed that Deputy Goodney intentionally fired his weapon at Luis. We therefore conclude that Escobar's wrongful-death claim does not fit within the scope of the Tort Claims Act's waiver of governmental immunity. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2); *Delaney v. Univ. of Houston*, 835 S.W.2d 56, 60 (Tex. 1992) ("[T]he intentional tort exception could not be circumvented merely by alleging that the government was negligent in supervising the employee-tortfeasor . . . ."); *Medrano v. City of Pearsall*, 989 S.W.2d 141, 144 (Tex. App.—San Antonio 1999, no pet.) (refusing to allow claims for negligent hiring and training when underlying conduct was police assault). Accordingly, Escobar's second issue is overruled.

## II. Review of summary judgments

We review a trial court's decision to grant a traditional motion for summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The movant has the burden of showing that no genuine issue of material fact exists and that it is therefore entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–

9

16 (Tex. 2003). This requires that a defendant moving for summary judgment either conclusively negate at least one essential element of the plaintiff's cause of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). To determine whether there is a disputed material fact, we consider evidence favorable to the nonmovant as true and draw every reasonable inference in her favor, resolving all doubts on the side of the nonmovant. *Knott*, 128 S.W.3d at 215. "A summary judgment may be based on uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c).

The no-evidence motion for summary judgment is a different procedure. A party may move for no-evidence summary judgment on the ground that no evidence exists of one or more essential elements of a claim on which the adverse party bears the burden of proof at trial. TEX. R. CIV. P. 166a(i). The motion should be granted unless the non-moving party produces competent summary-judgment evidence to raise an issue of material fact. *Id.* A court should sustain a no-evidence motion if the "evidence offered to prove a vital fact is no more than a mere scintilla." *City of Keller v. Wilson*, 168 S.W.3d 802, 810, 823 (Tex. 2005). Like the traditional motion, a no-evidence motion is reviewed de novo and requires that we

consider the evidence in the light most favorable to the non-movant. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156–57 (Tex. 2004).

Section 1983 provides a private right of action against persons acting under color of state law who violate rights secured by federal law. The statute provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. A section 1983 claim has two basic elements: the challenged conduct must be committed by a person acting under color of state law, and it must violate a right secured by the Constitution or the laws of the United States. *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254–55 (1988).

Section 1983 is not a source of substantive rights; instead it creates a cause of action against state actors for enforcement of those rights. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S. Ct. 1865, 1870 (1989); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994). The right at issue in this case is protected by the Fourth Amendment to the United States Constitution, which prohibits the use of excessive force to seize a fleeing suspect. *Graham*, 490 U.S. at 394, 109 S. Ct. at 1871; *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020

11

(2014). The use of deadly force cannot be justified solely because a suspected criminal is fleeing: "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701 (1985). Deadly force is only a constitutional option when an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* Whether a sufficiently serious threat exists is a matter of objective reasonableness, not subjective belief, which nonetheless takes into account the facts and circumstances faced by the individual officer. *Graham*, 490 U.S. at 396–97, 109 S. Ct. at 1872. The reasonableness of the use of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Qualified immunity is an affirmative defense to a section 1983 claim. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S. Ct. 1920, 1924 (1980). The doctrine of qualified immunity strikes a balance between the necessity that actions for damages be available as an "avenue for vindication of constitutional guarantees" and the recognition that "claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736 (1982). The analysis of whether a government official performing a discretionary function is entitled to qualified immunity thus involves a two-pronged inquiry: a plaintiff must

12

show that the defendant's conduct violated the plaintiff's constitutional rights and that the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 815–16 (2009); *Tolan*, 134 S. Ct. at 1865–66. Thus, "[g]overnmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tolan*, 134 S. Ct. at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002)).

The affirmative defense of qualified immunity is intended to permit "resolution of many insubstantial claims on summary judgment." *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738. As such, it not a merely a defense to liability, but it is an immunity from suit that should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) (per curiam). Following Fifth Circuit precedent,[2] our court has held that the qualified immunity defense is implemented through a shifting burden of proof:

---

[2]  *See Tex. Dept. of Criminal Justice v. Thomas*, 263 S.W.3d 212, 219 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987)); *Scott v. Britton*, 16 S.W.3d 173, 180 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (also citing *Whatley*); *Thomas v. Collins*, 860 S.W.2d 500, 503 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (also citing *Whatley*).

When a governmental official asserts the affirmative defense of qualified immunity by pleading good faith and demonstrating that his actions were within his discretionary authority, the burden shifts to the plaintiff to show that the defendant's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have been aware.

*Tex. Dept. of Criminal Justice v. Thomas*, 263 S.W.3d 212, 219 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987)); *see also McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) ("When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense."). The Fifth Circuit has further explained how it applies this shifting burden:

Although we sometimes short-handedly refer to only one party's burden, the law is that both bear a burden. *The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority*. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. The Fifth Circuit does not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.

*Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992) (emphasis supplied, citations omitted). This procedure essentially mirrors traditional summary-judgment practice in Texas state courts with respect to affirmative defenses, requiring the movant to establish the essential elements of the affirmative defense, then shifting the burden to the nonmovant to come forward with evidence to demonstrate a genuine issue of material fact in order to defeat summary judgment. *See, e.g.*,

14

*Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996); *cf. Chambers*, 883 S.W.3d at 656–57 (in context of summary-judgment motion asserting state-law official immunity defense, "an officer must prove" the applicability of the affirmative defense).

When, as in this case, the trial court's order granting summary judgment does not specify its grounds, "we may affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious." *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). We will only consider as grounds for reversal issues that were "expressly presented to the trial court by written motion, answer or other response." TEX. R. CIV. P. 166a(c). As in any other review of a summary judgment, if deciding the merits of a claim of qualified immunity requires resolving issues of material fact, then summary judgment is inappropriate. *See, e.g.*, *Gotham Ins. Co. v. Warren E & P, Inc.*, No. 12–0452, 2014 WL 1190049, at *7 (Tex. Mar. 21, 2014); *cf. Tolan*, 134 S. Ct. at 1866.

## A.     Summary judgment for Deputy Goodney

Deputy Goodney's motion claimed that no constitutional violation occurred and that, alternatively, he was shielded by qualified immunity. In her third issue, Escobar argues that she produced sufficient evidence to establish a genuine issue of material fact as to whether Deputy Goodney violated Luis's right to be free from

seizure by excessive force, arguing that "Deputy Goodney was not threatened with a weapon of any sort" and "[t]he use of deadly force against an unarmed fleeing suspect is unconstitutional."[3] She also contends there is a fact issue as to whether the deputy is entitled to qualified immunity, arguing that she "has presented a factual scenario where Deputy Goodney's use of force constitutes a violation of clearly established Fourth Amendment law, and which no reasonable officer would interpret to be otherwise." She therefore claims that the trial court erred in granting summary judgment. Escobar concedes that Deputy Goodney pleaded qualified immunity, that he is a governmental official whose position involves the exercise of discretion, and that she bears the burden to rebut the applicability of the defense. Appellant's Br. at 27 (citing *Salas*, 980 F.2d at 306). Therefore we must survey the summary-judgment record in the light most favorable to Escobar to determine

---

[3]    Escobar's appellate brief also emphasizes the lack of any warning before Deputy Goodney resorted to the use of deadly force. Such a warning is required, if feasible. *See Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S. Ct. 1694, 1701 (1985). However, because Escobar did not mention in the trial court the failure to warn as a reason to deny summary judgment, we will not consider that argument on appeal. TEX. R. CIV. P. 166a(c) (grounds for reversal must be issues that were "expressly presented to the trial court by written motion, answer or other response"); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) ("With the exception of an attack on the legal sufficiency of the grounds expressly raised by the movant in his motion for summary judgment, the non-movant must expressly present to the trial court any reasons seeking to avoid movant's entitlement . . . and he must present summary judgment proof when necessary to establish a fact issue.").

16

whether she presented evidence to raise issues of material fact on her underlying section 1983 claim and Deputy Goodney's affirmative defense of qualified immunity.

Deputy Goodney disavowed the facts surrounding the car chase as justifications for his use of deadly force against Luis. We therefore focus on the evidence of what happened after the pursuit ended with Luis's collision with several cars in the intersection. Deputy Goodney's sworn statement from the night of the incident described those events as follows:

> [Luis's] black vehicle ran the red light as it turned right (south) on Veteran[s] Memorial and continued to accelerate. As we approached the intersection of Antoine, I was the only pursuing patrol unit and the southbound light turned red just prior to the black car reaching the intersection. It was apparent to me that the black vehicle was not intending to stop for the traffic signal, but I slowed down to cross the intersection with caution.
>
> The black vehicle was struck by a vehicle traveling through the intersection on Antoine and spun around, and came to rest facing north in the outside lane of the southbound lanes. I drove up to the front of the black vehicle and brought my patrol car to a stop near the driver door in an attempt to block the driver from fleeing. I could see three (3) people inside the vehicle at that time, two (2) in the front seats and one (1) in the rear seat.
>
> I exited my patrol car with my weapon (handgun) drawn, and used the driver door of my vehicle for cover. I shouted in a loud voice several times for the occupants of the vehicle to show me their hands. The two (2) passengers eventually complied with my verbal commands, but the driver did not. The driver of the black vehicle opened the driver door and stepped out of the vehicle; at the same time he was looking or staring right at me with a "glazed" look in his eyes. When he was outside of his vehicle he turned with his back towards me and I

17

continued to issue verbal commands to the driver, telling him to show his hands and to lie on the ground. The driver appeared to reach into the waistband of his pants, towards the crotch area. At that time, I believed the driver of the vehicle was retrieving a weapon and discharged my handgun towards him out of fear for my personal safety. I fired 2 or 3 times as the driver was standing beside the black vehicle, at that time he turned and ran away from the vehicles, going south on the shoulder of the road. I was trying to maintain cover of the 2 passengers inside the vehicle and at the same time watch the driver as he was running away. The passengers inside the vehicle were continuing to comply and *as the driver was running into the driveway of the Walgreen's he turned back and looked in my direction while reaching towards his waistband again*. Because of the driver's actions, I again felt he was reaching for a weapon and discharged my handgun at least one more time, but maybe twice. After that he stumbled a few steps and collapsed.

(Emphasis supplied.) Deputy Goodney also presented the report of an expert witness with training and experience in law enforcement tactics and the use of force by police officers. This expert witness opined that it was physically possible for Luis to have been facing Deputy Goodney at the time the shots were fired, as claimed in the deputy's affidavit, even though the bullets struck Luis from the rear as indicated in the autopsy report. The expert specifically stated:

Assuming that Mr. Escobar were standing erect and facing Deputy Goodney with his firearm pointed at him, it could have taken Escobar anywhere from .33 hundreds (or sooner) of a second to .58 hundreds of a second (or longer) to reach for his waistband and then turn his upper body 180 degrees in the opposite direction to avoid being shot.

In response to the summary-judgment motion, Escobar offered into evidence the autopsy report, showing that Luis was struck with three bullets that passed

from his back to the front of his body.[4] Also attached to the response (among other things) were sworn statements of two bystander witnesses and three different accounts of the incident by Deputy Goodney, which Escobar described as being "contradictory": his original sworn statement, a transcript of a subsequent interview conducted by Internal Affairs, and a transcript of his deposition.

On the night of the incident, between the hours of 1 a.m. and 3 a.m., bystander witnesses Eric Williams and Jose Gomez gave sworn statements to deputies investigating the incident. Williams was riding in the front passenger seat of a car driven by his "god-brother," Jonathan Thomas. Williams's sworn statement said:

> Jonathan was driving south on Veterans Memorial when we approached Antoine and heard sirens coming from behind our car. We had been driving in the far right lane when the police car approached us from behind. Jonathan moved our vehicle over to the far left lane to allow the police car and the car it was chasing to pass.
>
> When the vehicles passed us, I saw a white Sheriff's Office car chasing a black Chevy Impala. The black Impala attempted to enter the intersection of Veterans Memorial and Antoine and was struck by a black car. This caused the black Impala to lose control and spin

---

[4] The autopsy report included pathological findings of multiple gunshot wounds, including a gunshot wound "of right back" which entered at the "right paramedian back," a gunshot wound "of left back" which entered at the "left back," and a gunshot wound "of proximal left arm" which entered at the "posterior left arm." A diagram specifically identifies the entrance points of all three gunshot wounds at approximately the same height across Luis's back.

around, striking several other vehicles that had been going north on Veterans Memorial. The black Impala ended up sliding backwards before coming to a stop with the Sheriff's car coming to a stop right next to it. The black Impala was facing north at this time and was "nose to nose" with the Sheriff's vehicle.

Jonathon and I had come through the intersection in his vehicle after the vehicles had passed. Jonathan parked his car approximately thirty feet behind the Sheriff's car. The deputy had parked his car between the black Impala and Jonathan's car. As soon as the black Impala and the Sheriff's vehicle stopped, I saw a Hispanic male get out of the driver's side front door. I don't remember what the Hispanic male was wearing or his physical features. The male ran towards the McDonalds. The deputy also got out of his vehicle and was standing by his open door.

As soon as the deputy exited his car he fired his weapon approximately three (3) times. The Hispanic male continued to run towards the McDonalds after the deputy fired. The deputy moved to the front of his car and fired approximately three (3) more times in the direction of the Hispanic male. As soon as the deputy fired the second time the Hispanic male fell to the ground.

The other bystander witness, Gomez, was riding in a truck with his nephew when he also witnessed the crash that concluded the pursuit. His sworn statement said:

. . . we were traveling southbound on Antoine. We were stopped at the intersection of Antoine and Veterans Memorial for a red light. I saw a white Sheriff's Office vehicle chasing a black car south on Veterans Memorial. The vehicles were approaching the intersection of Veterans Memorial and Antoine. The lights at the intersection for south bound and north bound traffic on Antoine turned green and a black vehicle pulled out into the intersection. This vehicle was traveling north on Antoine. The black vehicle that pulled out into the intersection was struck by the black vehicle being pursued southbound on Veterans Memorial by the Sheriff's Office vehicle. This caused the car being pursued to lose control and strike several other vehicles. The car being

20

pursued then spun around and came to a stop with the trailing police vehicle stopping next to it.

I exited the truck and ran towards the Sheriff's Office vehicle. The reason I did this was because I could only see one deputy at the scene. I intended to assist the deputy because I saw the black vehicle contained several occupants.

As I approached the two vehicles I could see the deputy standing near the front of his vehicle. At this time, none of the occupants of the black vehicle had exited. I could hear the deputy yelling at the occupants of the car to "put your hands up". I was approximately two car lengths behind the deputy's car when this was happening. A Hispanic male exited the car from the driver's side and began running towards the McDonalds. When the Hispanic male exited the drivers side of the car, I had by this time, made my way around to the passengers side of the car. I did this because I did not know which way the male was going to run. The Hispanic male was not running fast because he had on very baggy pants which were falling down around his waist. The male was attempting to hold his pants up with his hands as he was running.

As the Hispanic male ran past the rear of the black car, I heard three gunshots. The Hispanic male fell to the ground on the second shot. I looked back towards the deputy and saw he was standing near the front of his vehicle.

Other deputies arrived on the scene and removed the remaining males from the black car. Seeing the scene was under control I moved across the street to a parking lot. When deputies began putting up yellow tape around the scene I yelled several times at the original deputy "You didn't have to shoot him!" I was then placed in a Sheriff's Office car until I was transported to the investigators offices.

The undisputed facts thus indicate that the chase proceeded southbound on

Veterans Memorial Drive, through the intersection with Antoine Drive where Luis

collided with other vehicles and spun around. Deputy Goodney proceeded through

21

the intersection and stopped on the other side of the intersection with his car nose-to-nose with Luis's car. In other words, when the cars came to rest, the patrol car continued to face southward on Veterans Memorial, while Luis's car had spun around to face northward.[5] As the two men got out of their cars from the respective drivers' sides, Luis would have gotten out on the side of his car closest to the "shoulder" of the outer southbound lane of Veterans Memorial, while Deputy Goodney would have gotten out of his southbound-facing car on the side closest to the southbound traffic. The various accounts are also in harmony to the extent they describe Luis as running "away" from Deputy Goodney and the two cars—in a southerly direction, on the side of the road, toward the Walgreens pharmacy and a McDonald's restaurant.[6]

## 1.    Evidence of a constitutional violation

Deputy Goodney's use of deadly force to seize Luis was a violation of his constitutional rights unless the officer had probable cause to believe that he posed a threat of serious physical harm. *See Garner*, 471 U.S. at 11, 105 S. Ct. at 1701.

---

[5]    The internal affairs case summary report, attached to Escobar's response, found that "The Impala came to a complete stop approximately 175 feet south of the intersection, facing north in the southbound lane."

[6]    The internal affairs case summary report stated that Luis "turned completely away from Deputy Goodney and fled southbound on foot along the edge of Veterans Memorial," then "turned westbound in the driveway of the Walgreens store, approximately 45 feet away."

22

There is no suggestion that after leaving his wrecked car, Luis posed a threat of serious physical harm to anyone other than Deputy Goodney. Accordingly, we must evaluate whether a genuine issue of material fact has been rasied as to whether the deputy's perception of such a risk was objectively reasonable under the circumstances. *Id.* at 396–97, 109 S. Ct. at 1872.

Deputy Goodney's legal justification for the use of deadly force depends upon his factual contention that he feared for his personal safety based on his perception that Luis looked in his direction and reached toward his waistband, where he could have been reaching for a weapon. By Deputy Goodney's account, this happened twice. First, he fired his gun before Luis "turned and ran away from the vehicles." No evidence suggests that Luis had been hit by any of these first shots.[7] Then as Luis was running into the driveway of the Walgreens pharmacy, according to Deputy Goodney, he "turned back and looked in my direction while reaching towards his waistband again." Deputy Goodney contends that he again perceived a threat to his personal safety based on the possibility that Luis was

---

[7]    In her response to Deputy Goodney's motion, Escobar emphasized that Luis's body was found 45 feet away from where the shots were fired, and no blood was found between the Impala and the immediate vicinity of where the body was found. This factual account, which suggests that Luis was not hit by the first shots fired by Deputy Goodney, appears to be undisputed for purposes of the summary-judgment motion.

reaching for a weapon. It was at this point that he fired the fatal shots, and Luis "collapsed."

Escobar argues there is a genuine issue of material fact as to Deputy Goodney's claim that he perceived a threat from Luis, who was actually unarmed and fleeing, and she argues that the evidence also supports a conclusion that Luis was running away at the time the shots were fired. In support of that position, in her response Escobar relied on the bystander accounts that Luis was running away, and also the autopsy report, which showed that three bullets struck Luis from behind. She also argued that Deputy Goodney's "own statements create factual issues involving credibility, plausibility and obvious contradictions." As an example of the alleged contradictions in the deputy's accounts, Escobar points out although the deputy claimed in his sworn statement that Luis "appeared to be reaching towards his waistband," later in a deposition he testified that he never saw Luis's hands. Escobar also suggests an inconsistency between the deputy's initial sworn statement, in which he said he shot "only once or twice" just before Luis collapsed, which conflicts with the evidence showing that three shots entered Luis's body, all "at the same height," immediately before he collapsed.

Even without parsing the statements of bystanders Gomez and Williams,[8] the summary-judgment evidence includes the autopsy report, which shows that Luis was hit three times from the rear. It is undisputed that Luis was struck and fell to the ground after the second series of shots. However, Deputy Goodney claims that Luis had turned and was looking at him the second time he fired his weapon. Although an expert witness opined that it was possible that Luis could have been

[8] While we do not place our primary reliance on this consideration, a close reading of the bystander statements that resolves doubts in favor of nonmovant Escobar does suggest meaningful differences in the sequence of events. The Williams statement suggests that Luis got "out of the driver's side front door" and began running "towards the McDonalds." According to Williams, "[a]s soon as the deputy exited his car he fired his weapon approximately three (3) times." Luis then "*continued* to run towards the McDonalds *after* the deputy fired." (Emphasis supplied.) In contrast, Deputy Goodney claimed that he had taken up a defensive position behind the driver's side door of his cruiser, and only after that were the first shots fired—after Luis left his vehicle and faced Deputy Goodney, who was already standing behind the driver's door of his cruiser with his weapon drawn. Regarding the second set of shots, Deputy Goodney claimed that "Luis turned back and looked in my direction while reaching toward his waistband again." Neither of the bystander witnesses mentioned Luis turning to face Deputy Goodney's direction. Gomez said that he heard three gunshots as Luis "ran past the rear of the black car," while Williams simply said that "the Hispanic male continued to run towards the McDonalds." From the bystanders' words used to describe Luis's movements at the times Deputy Goodney fired—"as the Hispanic male ran past" and "continued to run"—it reasonably could be inferred that they described Luis as running away at the time Deputy Goodney fired his weapon. Although Gomez described Luis as "attempting to hold his pants up with his hands as he was running," neither bystander witness referenced Luis stopping, turning, or reaching in his waistband.

facing Deputy Goodney at the time the shots were fired,[9] even though all three bullets ultimately struck Luis from behind, that expert did not claim that the autopsy was solely compatible with this version of events. As such, the autopsy report, viewed in the light most favorable to Escobar as the nonmoving party, supported an inference, based on the bullets' entry points, that Luis had his back to Deputy Goodney when the gun was fired. *Cf. Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) (reversing summary judgment on excessive force § 1983 claim and emphasizing the nature of the wounds as evidenced by the medical examiner's report indicating a gunshot through the back, which raised a serious question as to the reasonableness of the officer's conduct—"more of a question of fact than a court may dispose of on summary judgment").

Accordingly, and contrary to Deputy Goodney's argument, the evidence is not undisputed, and it does not conclusively show, that from his perspective Luis appeared to reach in his waistband. The deputy places his primary reliance on *Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009), a case he describes as "most instructive regarding the issues in this case." *Manis* dealt with a man found drunk

---

[9] The expert opined: "It is possible that Mr. Escobar faced Deputy Goodney at the time Deputy Goodney made the decision to discharge his weapon, and that as the trigger was pulled on the firearm, Mr. Escobar rotated his body 180 degrees away from the deputy causing the three bullets that were fired at him to strike him in the upper torso."

and asleep in a SUV. 585 F.3d at 842. When police officers approached, Manis was angry—cursing, shouting, and flailing his arms while his seat belt was still fastened—and he repeatedly reached underneath the front seat. *Id.* When he started to straighten up, he appeared to be holding something in his hands, and an officer shot him four times. *Id.* The court decided that the officer's use of force was reasonable. *Id.* at 845. The situation is distinguishable because the plaintiff in that case did not dispute "the *only* fact material to whether [the officer] was justified in using deadly force: that Manis reached under the seat of his vehicle and then moved as if he had obtained the object sought." *Id.* at 844. Given that this fact was not at issue, the court found it reasonable for the officer to believe that Manis posed a threat of serious harm. *Id.* Indeed, by distinguishing circumstances involving an autopsy report that contradicts an officer's uncorroborated version of events, the Fifth Circuit has expressly acknowledged that such circumstances can create the kind of genuine dispute that overcomes summary judgment in an excessive force case involving a police shooting. *See Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 385 (5th Cir. 2009).

Deputy Goodney himself was the sole source of evidence that Luis appeared to reach for a weapon. As a general rule, "the testimony of an interested witness, such as a party to the suit, though not contradicted, does no more than raise a fact issue to be determined by the jury." *Cochran v. Wool Growers Cent. Storage Co.*,

140 Tex. 184, 191, 166 S.W.2d 904, 908 (1942). Even if uncontroverted, the testimony of an interested witness "does no more than raise an issue of fact to be determined by the jury," unless it is "clear, direct and positive" and "free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon." *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009). We conclude, based upon this record, that Deputy Goodney's testimony that Luis appeared to reach for a weapon did not conclusively establish that no constitutional violation occurred, but instead raised "an issue of credibility upon which the jury must pass." *See Collora v. Navaro*, 574 S.W.2d 65, 69 (Tex. 1978). We therefore hold that there is a genuine issue of material fact as to whether Deputy Goodney violated Luis's constitutional right to be free from seizure by excessive force. However, this does not complete our analysis because we must still address the issue of qualified immunity.

## 2. Clearly established law and qualified immunity

After Deputy Goodney raised the affirmative defense of qualified immunity, the burden of persuasion fell on Escobar to negate the defense. *See Thomas*, 263 S.W.3d at 219. In order to negate an officer's assertion of qualified immunity, a plaintiff must prove not only that the officer's actions violated a constitutional right, but also that the right at issue was clearly established. *Tolan*, 134 S. Ct. at 1865–66; *Pearson*, 555 U.S. at 232, 129 S. Ct. at 815–16. At the summary-

judgment stage, we do not decide whether the plaintiff has met her ultimate burden of proof but only whether the summary-judgment evidence presents issues of material fact. *See* TEX. R. CIV. P. 166a(c), (i).

As we have already explained, the relevant circumstances are disputed with respect to whether Deputy Goodney perceived a threat of serious physical harm to himself. The resolution of the qualified immunity issue in this case turns on the same disputed issue of material fact previously discussed—whether Luis appeared to reach in his pants for a weapon. If he did, then the clearly established law permits the use of deadly force. If he didn't, then the clearly established law prohibits it. In such a circumstance, summary judgment is not available to determine that Deputy Goodney was entitled to qualified immunity on the grounds that he reasonably perceived a threat that would justify using deadly force against a fleeing suspect. *See, e.g.*, *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 417 (5th Cir. 2009).

\* \* \*

We conclude that Escobar presented evidence sufficient to establish a genuine issue of material fact as to each essential element of her section 1983 claim against Deputy Goodney and to overcome his claim of qualified immunity. *See* TEX. R. CIV. P. 166a(c), (i). Accordingly, summary judgment is inappropriate on this record. Escobar's third issue is sustained.

29

**B. Summary judgment for the County**

In her first issue, Escobar argues that the trial judge erred in granting summary judgment in favor of the County on her section 1983 claim. She asserts that sufficient evidence supported each of three theories of liability for the County: (1) an official policy or custom authorizing the use of unconstitutionally excessive force; (2) failure to train; and (3) failure to supervise. The County's motion for summary judgment presented evidence of the relevant policies of the sheriff's department, including written policies pertaining to the training and commission of deputy sheriffs, disciplinary procedures, procedure governing the use of force, and the responsibilities of supervisors. Based upon this evidence, the County argued that Escobar would be unable to adduce any evidence to support her theories of liability for the County.

A municipality can be held liable under section 1983 if it "subjects, or causes to be subjected" a person within its jurisdiction "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The United States Supreme Court has interpreted this provision to apply to municipalities, though they "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S. Ct. 1292, 1298–99 (1986). Rather, "it is when execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S. Ct. at 2037–38. To establish municipal liability, there must be proof of three elements: a policymaker, an official policy or custom, and a violation of a constitutional right whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

**1.      Unwritten policy or custom**

Escobar contends that the County has an unwritten policy or custom of allowing an officer to use deadly force whenever he subjectively fears for his safety. As alleged in the original petition:

The custom, practice or policy includes, but is not limited to:

(i)      Allowing, encouraging, requiring and/or training officers to use firearms, in situations where the officers would prefer not to physically restrain suspects, or as in this case, where restraint was not called for, and instead using less obtrusive and/or harmful tactics;

(ii)     Allowing, encouraging, requiring and/or training officers to use firearms in lieu of physical restraint and proper detention techniques, or less confrontational and less harmful methods;

(iii)    Allowing, encouraging, requiring and/or training officers to use excessive force as a first resort rather than training officers to assess the totality of circumstances in an objectively reasonable manner; and

31

(iv) Allowing, encouraging, requiring and/or training officers to confront a fleeing suspect in the same manner as a suspect posing an immediate and objectively reasonable threat to officer safety.

She thus contends that as a matter of policy and practice, the County treats a deputy's assertion that he feared for his life as "magic words" of exoneration, and it was by invoking this formula that Deputy Goodney escaped discipline.

"An act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388 (1997); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 926 (1988) (plurality op.); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168, 90 S. Ct. 1598, 1613–1614 (1970). "A pattern is tantamount to official policy when it is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009). "Isolated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability." *Piotrowski*, 237 F.3d at 581. "A customary municipal policy cannot ordinarily be inferred from single constitutional violations." *Id.*

32

In its motion for summary judgment, the County presented evidence to establish that it had "proper use of force and training policies in effect at the time of the incident." This evidence included an affidavit from Major R. Silvio, who was in charge of the Patrol Bureau of the Harris County Sheriff's Office, where Deputy Goodney served. Silvio pointed out that the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") establishes standards for the training, certification, and licensing of peace officers in the State of Texas.[10] According to Silvio's affidavit and the attached written policy on the training and commission of Harris County Sheriff's Deputies, to be employed as a deputy a person must attend and successfully complete a TCLEOSE-approved and certified training academy, and be licensed by that agency. The required training included training in the use of deadly force. Silvio's affidavit also attached the department's written policy on the use of force, which stated, among other things:

> Use of deadly force must be in accordance with all applicable State and Federal laws. A Deputy is justified in using deadly force against another when and to the degree the deputy reasonably believes the action is in defense of human life, including the deputy's own life, or

---

[10]    *See* 37 TEX. ADMIN. CODE § 217.1 (2014) (Tex. Comm'n on Law Enforcement, Minimum Standards for Initial Licensure); *id.* § 219.1 (Tex. Comm'n on Law Enforcement, Eligibility to Take State Examination); *id.* § 221.1 (Tex. Comm'n on Law Enforcement, Proficiency Certificate Requirements); *id.* § 221.3 (Tex. Comm'n on Law Enforcement, Peace Officer Proficiency).

in defense of any person in imminent danger of serious physical injury.

. . . .

A Deputy is authorized to use only the necessary and reasonable amount of force to effect an arrest and deter any aggression or resistance on the part of the subject being arrested.

Consistent with Silvio's affidavit, Deputy Goodney stated in his affidavit that he was trained in the use of deadly force.

In response to the County's motion for summary judgment on claims arising from the alleged written policy of permitting use of unconstitutionally excessive force, Escobar argued:

> An unconstitutional custom has developed regarding the Harris County policy covering the use of deadly force. This custom allows Harris County employees to escape discipline by use of simply key words that seem to justify an increasing pattern deadly force incidents. In 51 incidents of deadly force investigated by the Internal Affairs Division (IAD) of the Harris County Sheriff's Office in the five year period before Mr. Escobar was killed, Harris County deemed only ONE (1) instance of deadly force "unjustified". (*See IAD Deadly Force Investigations, 2004-2009, Exhibit Q*). Stated differently, in each case where the Harris County employee involved stated that their actions were based on a fear for safety, only once was the use of deadly force deemed unjustified. *Id*.

But while Exhibit Q is evidence of the bare fact that there have been incidents of deadly force involving Harris County law enforcement personnel, followed by

34

internal investigations of those incidents,[11] it does not include any detail of the incidents that would permit an inference that the determinations that other incidents of deadly force were "justified" were not themselves justified by the facts as determined by Internal Affairs. As such, Escobar's evidence failed to raise a genuine issue of material fact as to whether there is a pattern of unconstitutional actions from which an unwritten County policy could be inferred.

Escobar nonetheless argues that the County's unwritten policy also can be inferred from the fact that the Administrative Discipline Review Committee considered Deputy Goodney's conduct and found it "justified," a finding which precluded disciplinary action. Her response to the County's summary-judgment motion included all of the evidence offered in response to Deputy Goodney's motion, including the affidavits of bystanders Williams and Gomez, the transcript

---

[11] The first page of Exhibit Q is a list of 26 incidents, apparently dated from 2004 to 2006, in which there was a "DEPUTY INVOLVED" and "DEADLY FORCE." Of that list of 26 incidents, one was resolved as "sustained," one was "not sustained," and one was found "not justified." The remaining 23 incidents on the list were found to be "justified."

The remainder of Exhibit Q consists of 25 Internal Affairs Division Confidential Investigation reports involving "Deputy Involved Deadly Force," dated 2007 to 2009. Two of these reports were resolved with the findings of "no violations of law," "no violations of policy," and "training issues referred to sheriff." In the other 23 reports, the actions of the officers were found to be "justified" or the officer was "exonerated." In one of those instances, the report additionally noted: "fail to qualify with firearm – letter of reprimand."

of Deputy Goodney's interview with internal affairs, and the autopsy report. Escobar also provided the report produced by Internal Affairs that was given to the Administrative Discipline Review Committee, which shows that the committee had all of this information. Escobar thus argues that by failing to discipline Deputy Goodney, its "approval" of his actions "leads to the inference that Harris County has a policy that condones the use of excessive and deadly force against fleeing suspects both before and after the shooting death of Luis Escobar."

We have held that for purposes of her section 1983 claim, Escobar's evidence raised a fact issue as to whether Deputy Goodney violated Luis's constitutional right to be free from seizure by excessive force. But the fact that the disciplinary committee had before it the same evidence entails only that the committee faced the same fact issues that would confront a jury; it is not evidence that shows the committee was acting out an unwritten policy of allowing officers to use deadly force whenever they feel their safety is threatened. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1279 (5th Cir. 1992) (holding that section 1983 plaintiffs "presented nothing but conjecture" when they alleged that city officials must have known that officer was lying). Escobar offered no other evidence of the committee's decisionmaking process, the information before it, or other facts that may have been known to it. Based on the evidence before it, the disciplinary committee reasonably could have credited the statements in Deputy Goodney's

36

affidavit that Luis reached into his waistband and appeared to retrieve a weapon. *See Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986) (explaining that a police chief was not liable merely for accepting his subordinate's reasonably defensible version of events). In such circumstances, courts have held that the use of deadly force is not constitutionally excessive. *See Manis*, 585 F.3d at 844; *Ontiveros*, 564 F.3d at 384. Accordingly, the fact that the disciplinary committee found Deputy Goodney's actions justified in a particular incident is not itself evidence tending to show that the County had an unwritten policy of allowing its officers to use constitutionally excessive force. As such, Escobar's evidence did not raise an issue of material fact as to the existence of a custom or unwritten policy allowing the use of unconstitutionally excessive force.[12] *See* TEX. R. CIV. P. 166a.

---

[12] In her petition, Escobar alleged that "Harris County, by and through the Harris County Sheriff's Office, ratified the conduct of its deputies and officers in that one or more authorized policymakers for the county approved of such deputies and the basis for them, thus making the county responsible for such conduct." *See Harris Cnty. v. Nagel*, 349 S.W.3d 769 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (allowing recovery against a government employer under a ratification theory). However, Escobar did not press her ratification theory on appeal by including the issue in her brief. *See* TEX. R. APP. P. 38.1(f) ("The brief must state concisely all issues or points presented for review."); *Howeth Invs., Inc. v. City of Hedwig Vill.*, 259 S.W.3d 877, 889 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (refusing to consider issue that was absent from appellant's brief). Accordingly, unlike the *Nagel* case, there is no need for us to consider in this appeal whether the decision not to discipline Goodney could be considered a

## 2. Failure to train and failure to supervise

"In a § 1983 claim for failure to supervise or train, the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–91, 109 S. Ct. 1197, 1204–06 (1989) (requiring that section 1983 plaintiffs who allege failure to train demonstrate causation and deliberate indifference).

Escobar presented no evidence that Harris County failed to supervise Deputy Goodney. She raised no evidence that the Harris County Sheriff's Office lacks a regular command structure or supervisory system or that any such system of supervision was not in effect the night of the incident. On the contrary, Escobar's evidence shows that the department began an investigation and disciplinary process in the immediate wake of the shooting. *See Peterson*, 588 F.3d at 850 (evidence did not show failure to supervise when, among other things, law enforcement agency conducted internal investigation of incident).

---

"ratification" of his actions, or whether such an act could make the County potentially liable under section 1983 for subjecting Luis to a deprivation of his constitutional rights.

In her brief, Escobar asserts that Deputy Goodney's testimony shows that he "was on patrol without any direct supervision." However, an examination of Escobar's supporting citations to the record shows only the absence of testimony about supervision or superior officers, not a denial that he was supervised. She also points to Deputy Goodney's admission that he did not communicate his reasons for initiating pursuit of Luis to his dispatcher. This is also not evidence that Deputy Goodney was not supervised. *Cf. id.* (officer's failure to fill out post-incident report did not raise fact issue on failure to supervise).

Escobar further asserts, based upon Deputy Goodney's testimony, that he "continued the pursuit despite the *known* danger he believed this was causing to others." Relying on the department's manual for officers, Escobar argues that this was a violation of departmental policy. However, Deputy Goodney testified that Luis's conduct was "dangerous." Finally, Escobar relies on the fact that the dispatch log, showing ongoing radio traffic during the incident, does not include any communications from a supervisor. Escobar does not argue and presents no authority for the proposition that supervision of a law enforcement officer means constant contact with supervisors. Moreover, while the dispatch log does not show communications from a person identified as a supervisor or ranking officer, it does indicate that Deputy Goodney was communicating with dispatch and other officers. Thus, we cannot say that this evidence raises an issue of material fact as to

39

whether the County failed to supervise Deputy Goodney. *See* Tex. R. Civ. P. 166a(i); *Peterson*, 588 F.3d at 850.

With respect to her claim that the County failed to train Deputy Goodney, Escobar presented no evidence that "the failure to train . . . amounts to deliberate indifference." *Goodman*, 571 F.3d at 395. "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Escobar offered no direct evidence that County policymakers were aware that Deputy Goodney or any other officer had inadequate training in the use of deadly force. Likewise, Escobar did not offer probative circumstantial evidence, such as evidence of a pattern of violations, to establish deliberate indifference. *See id.*

In her brief, Escobar asserts that Deputy Goodney had received only "one hour of training after graduating from the academy in 2005" for use of force. She presents a "Training History Report" that indicates Deputy Goodney received one hour of training on "Use of Force." Escobar's characterization notwithstanding, the "Training History Report" is not evidence that the County failed to train Deputy Goodney, much less that its policymakers were deliberately indifferent to the need to train him. While only one training hour listed is labeled "Use of Force," the Report shows that Deputy Goodney had received over a thousand hours of training

40

and that hundreds of those hours were in fields relevant to use of deadly force, for instance, "Semi Auto Handgun," "Peace Officer Field Training," "Rapid Response to Active Shooter," and "Patrol Procedures."

Escobar also asserts that Deputy Goodney's testimony indicates that he does not understand departmental policies on the use of force. She contends that he "did not know the policy that governs vehicle pursuits, when the use of deadly force was authorized against fleeing suspects, or what constitutes a 'serious felony.'" Escobar's citations to the record, however, do not support her description of Deputy Goodney's testimony. For instance, Deputy Goodney affirmed that he was "familiar with the policy governing vehicle pursuits" even though he could not recite "every line" of it. *Cf. Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010) (evidence that officer expressed a legally incorrect interpretation of the plain view doctrine did not establish fact issue on failure to train claim). There is no evidence, circumstantial or direct, that the County failed to train Deputy Goodney or that any alleged failure to train "amounted to deliberate indifference." *See Goodman*, 571 F.3d at 395.

Since Escobar failed to come forward with evidence to raise an issue of material fact on elements of each of the theories of liability for the County that she presented, the trial court did not err by granting summary judgment for the County. *See* TEX. R. CIV. P. 166a(i). Escobar's third issue is overruled.

41

## Conclusion

We affirm the trial court's ruling granting the plea to the jurisdiction as to Escobar's wrongful-death claim and affirm the summary judgment entered in favor of the County. We reverse the summary judgment granted in favor of Deputy Goodney and remand the case for further proceedings consistent with this opinion.

Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.